## Fassitt, Appellant, v. Seip.

*Contracts—Minors—Agreement of parent with regard to minor child—Invalidity—Statute of limitations—Act of March 27, 1713, 1 Smith's Laws, 76—Credits.*

1. The mother of a minor child has no authority to bind it or to make any agreement which would affect its property rights, especially where the guardian of the child does not join in the agreement.

2. Section 5, of the Act of March 27, 1713, 1 Smith's Laws, 76, excepting infants from the operation of the statute of limitations, makes no distinction between infants with a guardian and without a guardian. It prevents the running of the statute in all cases where the person entitled to sue is within the age of twenty-

one years, and permits such person to bring the action after he arrives at full age.

3. In a suit in equity for the partition of real estate owned by plaintiff and defendant as tenants in common, where it appeared that plaintiff was a minor and that when she was two years of age her mother and defendant had entered into an agreement, whereby certain monthly payments were to be made to the mother, in consideration of which defendant's right to the possession of the property was not to be questioned, to which agreement plaintiff's guardian was not a party, the court made no error in deciding that the plaintiff's rights were not affected thereby, and that the statute of limitations was not a bar to the plaintiff's claim for an accounting for rentals and mesne profits during the whole period of defendant's occupancy, the legal title of the property, and, therefore, the right to sue, having been vested in the minor.

4. In such case defendant was entitled to credit for taxes, water rents, insurance and repairs paid on behalf of the minor, and for monthly payments made to the minor's mother, which were used for the support of the minor, but was not entitled to credit for expenditures in erecting new buildings or in the enlargement, reconstruction or improvement thereof.

Argued March 9, 1915. Appeals, Nos. 62 and 67. Jan. T., 1915, by plaintiff and defendant respectively, from decree of C. P. Northampton Co., June T., 1913, No. 1, in equity for partition, in case of T. Campbell Fassitt, guardian of Clarissa M. Veile, a minor, v. Belle R. Seip. Before BROWN, C. J., MESTREZAT, ELKIN, STEWART and FRAZER, JJ. Modified and affirmed.

Bill in equity for partition.

Exceptions to report of Frederick Green, Esq., Master. Before STEWART, P. J.

The master's report was in part as follows:

It is the contention of counsel for the defendant that at the meeting May 8, 1894, in the office of H. W. Scott, Esq., between Mr. Cope, Mrs. Florence R. Veile and Mr. Scott, her counsel, an agreement was reached which was in fact a compromise and family settlement, and that thereupon the receipt (Finding No. 4) was drawn up and duly executed by Mrs. Florence R. Veile, who re-

ceived a check for the first monthly payment of $40.00. This receipt contains this clause: "And hereby on behalf of the said Clarissa Veile declare that I accept all the provisions contained and set forth in the said last will and testament (Theresa Veile's) and codicil thereto." The master cannot agree to this view. The only proper party to make a valid agreement or compromise affecting the estate of this minor was her duly appointed guardian. The Easton Trust Company had been appointed to that office but a few days before this meeting. This guardian had the sole authority to act in this matter, but was not present or consulted. The testimony as to what took place at this meeting is very meagre. It does not appear that there was any discussion as to the estate, no disclosure as to its value or annual income, nothing said upon which it is possible to base an idea of a fair adjustment or compromise. The amount to be paid was the exact sum which Theresa Veile directed should be paid monthly for the proper education, maintenance and support of Clarissa M. Veile by the executor and trustee of her will. There does not seem to have been any compromise at all, certainly no mutual concessions; just the payment of the amount due Clarissa M. Veile under the will of Theresa Veile, and which Belle R. Seip was bound to make so long as she held the estate under the terms of that will. The receipt itself so describes the payment. This paper passed through the hands of careful attorneys. If it had been intended to be a written statement of an agreement to settle amicably any dispute under the will of Xavier Veile or Theresa Veile, such fact would certainly have appeared therein in terms. It may well be, as claimed by plaintiff's counsel, that counsel for Mrs. Veile permitted her to sign this receipt because he knew that the minor's estate could not be divested by it, and it was therefore harmless. Mr. James for the guardian may have had the same view but the master regards it as significant that the receipt for the second payment, June 7, 1894, written in

the same book by Mr. James, makes no reference to the previous receipt which contains Mrs. Veile's acceptance of all the provisions of Theresa Veile's will, and is in these words: "Easton, Pennsylvania, June 7, 1894. Received of Isabella R. Seip, executrix and trustee under the last will and testament of Theresa Veile, deceased, $40.00, being the amount of monthly payment set apart for the maintenance and support of Clarissa Veile. (Signed Florence R. Veile for Clarissa M. Veile.)" If Mr. James had wished to take some action at this time to put the guardian on record as approving the previous receipt or the alleged family settlement, and making the guardian responsible in any degree for what Mrs. Veile had done, he would have taken advantage of this opportunity, when he had in his possession the check for the monthly payment of $40.00, payable to the order of the ward, and the receipt book in which to receipt for the payment. Instead of doing anything of this kind, he drew a carefully worded receipt for Mrs. Veile to sign for the regular monthly payment due under the will of Theresa Veile, and gave her the check unendorsed by the guardian. His action makes it plain that the legally constituted guardian would have nothing to do officially with the arrangement which had been entered into by the mother of the ward. The master is of the opinion that this adjustment could not be sustained under the authorities. They speak of family settlements that "if fair and equitable" should not be disturbed, etc; Johnston v. Furiner, 69 Pa. 449; or "if fairly made," Walworth v. Abel, 52 Pa. 370; or "when made in good faith and with full disclosure," Bierer's App., 92 Pa. 265. As the master finds the fair rental value of these three properties is now and was at that time $4,800.00, it could not be claimed that a settlement based on a payment of $480.00 per year, and without any disclosure as to the value of the estate and the yearly rental, complied with these essential requirements. If this is the correct view with regard to this arrangement with Mrs.

Florence Veile, it necessarily follows that the plaintiff is not estopped because of the payments made by Isabella R. Seip, executrix and trustee, to plaintiff's mother from 1894 to 1911. That the plaintiff is entitled to recover from her cotenant mesne profits or rents cannot be disputed. The right of a tenant in common out of possession to recover his share of the income of the common property from his cotenant in possession was given by the English statute of 4 Anne c. 16, sec. 27. Tenants in common being seized per my et per tout, under the common law each one was entitled to the joint possession of the whole, and therefore there was no liability to account where one was in possession and the other was not. To remedy this the Statute of 4 Anne was passed. The English courts construed this act to apply only when one tenant in common receives the money from another person to which both parties are entitled, and keeps it all, or more than his just share. This statute is in force in Pennsylvania, and under it our courts have held that a tenant in possession need not account to his cotenant unless he had actually received rent from a third party for the premises, or had entered into a contract to pay rent to his cotenant for the property occupied and used by him. See Norris v. Gould, 15 W. N. C. 187. This is a decision by Judge THAYER of the Common Pleas of Philadelphia, which Justice MITCHELL in Enterprise Oil & Gas Company v. National Transit Company, 172 Pa. 421, commends and approves as "the best summary of the law in our own books" on this subject. See also Kline v. Jacobs, 68 Pa. 57; Coleman's App., 62 Pa. 252. Under these decisions a tenant in common out of possession in this State was without redress as against his cotenant who was occupying and using the common property until the passage of the Act of June 24, 1895, P. L. 237. This act gives the tenant out of possession the right to sue for his share of the rental value for the time the real estate was in the possession of the cotenant. Section one of this act provides: "In all cases in which

any real estate is now or shall be hereafter held by two or more persons as tenants in common, and one or more of said tenants shall have been or shall hereafter be in possession of said real estate, it shall be lawful for any one or more of said tenants in common, not in possession, to sue for and recover from such tenants in possession his or their proportionate part of the rental value of said real estate for the time such real estate shall have been in possession as aforesaid; and in case of partition of such real estate held in common as aforesaid, the parties in possession shall have deducted from their distributive shares of said real estate the rental value thereof to which their cotenant or cotenants are entitled." Upon his act and the Statute of 4 Anne is founded the right of the plaintiff to recover from the defendant mesne profits or rents not only for the Garren and Gies properties, rented by her to third parties, but also for the brewery property occupied and used by her. These two acts are considered in Lancaster v. Flowers, 208 Pa. 199. The court said "The English Statute of 4 Anne, c. 16, sec. 27, enables one tenant in common to maintain an action of account against this cotenant as bailiff for receiving more of the income than his just share or proportion, and the English courts have held that the statute applies only where 'one tenant in common receives the money from another person to which both parties are entitled by reason of their being tenants in common and their interests as such, and of which one receives and keeps more than his just share,' Henderson v. Eason, 79 Eng. Com. Law Rep. 701. The Act of June 24, 1895, P. L. 237, contemplates that where the property is held by tenants in common that the parties in possession shall have deducted from their distributive shares the rental value to which their cotenants may be entitled. These statutes supply the remedies not existing at common law, and cover the case where the cotenant out of possession is entitled to rental values and contemplate that these remedies shall be applied to such cases

of tenancy in common." In Dorrance v. Ryan, 35 Pa. Superior Ct., 180, speaking of the Act of June 24, 1895, P. L. 237, the court say "The ground upon which a tenant in common is liable to be called upon by his cotenant to account in an action of assumpsit for a proportionate share of the money which he has actually received as rent from a stranger is entirely different from that which makes him liable for mere use and occupation. The Act of June 24, 1895, P. L. 237, gave to tenants in common who have been out of possession a right to recover from those who have been in exclusive possession, their proportionate part of the rental value of real estate held in common. Prior to this statute one tenant in common could not maintain either trespass for mesne profits, as assumpsit or account render in order to compel a cotenant to pay for mere occupation of the premises, without showing either an ouster or an express promise to account or to pay something. But prior to the Act of 1895 a tenant in common was allowed to recover in assumpsit his share of the profits received by the cotenant from a stranger." See also Wells v. Becker, 24 Pa. Superior Ct. 174. The question of ouster does not arise in this case. Between tenants in common ouster must be proved by decisive acts of hostile character: Solomon v. Rogers, 13 Pa. Superior Ct. 70. Denial of title is not of itself ouster: Filbert v. Hoff, 42 Pa. 97. Ouster will not be presumed merely because cotenant takes the rents and profits: Watson v. Gregg, 10 Watts 289. It follows from these decisions that the defendant is liable to the plaintiff under the Statute of 4 Anne for the rents received by her from the Garren and Gies properties, but as to the brewery property she is liable for rental value under the Act of 1895. In the first case the courts regard her as a trustee for her cotenant of the rents collected, and hold her to a strict accountability. She cannot plead the statute of limitations and is liable for interest on the annual rents. In regard to the brewery property the master is of the opinion that she can be

compelled to account for rental value for a period of
six years only, that is from April 8, 1906, the action of
ejectment having been begun April 8, 1912.  In regard to
the Garren and Gies properties the case of McGowan
v. Bailey, 179 Pa. 470, is directly in point.  This was a
dower case.  The owner died in 1863, leaving a widow
and children.  No dower was set out.  The real estate
ultimately passed to defendants who, in 1884, opened a
coal mine and by 1893 had taken out most of the coal.
In that year the widow filed a bill for her one-third of the
value of the coal with interest, as a tenant in common.
The Supreme Court, in allowing the claim, said, "A ten-
ant in common exercises his undoubted rights to take
the common property, and he has no other means of ob-
taining his own just share than by taking at the same
time the share of his companions."  Cotenant "had a
right to mine and receive all the money for the coal in-
cluding her one-third.  It was not therefore an act hostile
to or in denial of her right.  As to her thirds they were
merely trustees for her, and long before lapse of time
raised a presumption of payment she made a demand for
an accounting.  It was held over and over again ever
since Dillebaugh's Est., 4 Watts 177, that 'the statute of
limitations in such cases is out of the question.' "  The
court also decided that she was entitled to interest for
the whole period the meantime being 1890, three years
before the action was commenced.  It is very plain from
these decisions that Mrs. Seip has received these rents
as trustee, that the statute of limitations cannot be
pleaded and therefore she must account for them from
April 8, 1894, with interest.

In the opinion of the master the right to recover rental
for the brewery property is upon a different basis.  It
arises under the Act of 1895, giving a tenant out of pos-
session the right to bring suit.  From April 8, 1894, to
June 24, 1895, Mrs. Seip was rightfully in possession of
this property and could not be called upon to pay any-
thing.  But from June, 1895, she became answerable to

her cotenant for the rental value. The plaintiff, by her
guardian, could have demanded at that time from the
defendant a fair annual rent, and in case of failure to
agree could have begun an action to protect her rights
and recover the rent. Nothing of this kind was done, and
the matter was permitted to remain undetermined and
uncontested until after the Easton Trust Company re-
tired from the guardianship in 1912, when on April
8th, of that year, Fassit, the then guardian, brought
the action of ejectment above mentioned. The question
now to be determined is whether the plaintiff shall re-
cover the rental value or mesne profits for the whole
period from June 24, 1895, or, being barred by the stat-
ute of limitations, only from a time six years prior to
the ejectment suit, that is from April 8, 1906. The stat-
ute of limitations of March 27, 1713, 1 Sm. L. 76, sec. 5,
expressly exempts infants from its operation, and if no
guardian had ever been appointed for this plaintiff, it is
not at all likely that this question would have been
raised. But the fact that there has always been, since
plaintiff's right first arose, a custodian with legal pos-
session of her estate and authorized and empowered to
protect her rights entirely changes the case. Is a guard-
ian privileged to slumber upon the rights of his ward,
while executors, administrators and trustees must be
alert to prevent the bar of the statute, even though the
beneficiaries of the estates they administer may be mi-
nors? There is every reason why a minor ignorant of
the fact that he is the owner of property, or without
capacity to take care of it or to proceed to protect his
title, should have the benefit of the exemption of this
act, but there is none whatever when his estate is in
the custody of a guardian. This summary of the au-
thorities is found in 25 Cyc. 1261: "In the majority
of juridictions, where the title or right of action vests
in a personal representative, guardian or trustee, who is
under no legal disability, the statute of limitations begins
to run, notwithstanding the minority of the beneficiary,

and where the former is barred the latter is likewise barred." In Meeks v. Olpherts, 100 U. S. 564, the court say, page 569, "Whatever doubt may have existed at one time on the subject, there remains none at the present day, that whenever the right of action of a trustee is barred by the statute of limitations, the right of the cestui que trust thus represented is also barred. This doctrine is clearly stated in Hill on Trustees, 267, 403, 504, and the authorities there cited fully sustain the text, both English and American." Citing Smilie v. Biffle, 2 Pa. 52; Couch v. Couch, 49 Ky. 160; Rosson v. Anderson, 49 Ky. 423; Darnall v. Adams, 53 Ky. 273. In Smilie v. Biffle, 2 Pa. 52, the court held "The rule in a court of equity, that the statute of limitations does not bar a trust estate, holds only as between the cestui que trust and trustee, not between the cestui que trust on the one side, and a stranger on the other." In Warfield v. Fox, 53 Pa. 382, the court say: "If it is a matter of public interest that titles to land should be quieted, it can be no hardship comparable to the mischief of permitting judicial decrees to be indefinitely liable to attack, or trusts unexecuted, and not in writing, to be asserted, that minors, femes covert and persons non compos mentis should be held to the same limitations as those applied to others. Ordinarily they have guardians and committees; if covert they have husbands, who may maintain their rights, whose duty and interest it is to assert them." While the court in this last case were construing the Act of April 22, 1865, P. L. 532, they recognize the general principle that where an estate is in the hands of guardians or committees this fact differentiates it from those not so protected.

The statute of limitations may be pleaded to all mesne profits beyond six years; Huston v. Wickersham, 2 W. & S. 308. It should be borne in mind that Mrs. Seip is not a bailiff or trustee as to the brewery property, she collected no rents to hold as a trust fund. She is in fact the "stranger" whose rights were recognized and con-

firmed in Smilie v. Biffle, supra. The authorities above cited seem to be ample to sustain the conclusion that she is entitled to the benefit of the statute of limitations. In Sopp v. Winpenny, 68 Pa. 78, which was an action of trespass for mesne profits brought in 1866, the court permitted a recovery from the time the action in eject-ment was begun in 1865. Following this precedent, the action in ejectment in the present case having been begun April 8, 1912, fixes the date from which to calculate the rental value as April 8, 1906.

It is conceded that defendant is entitled to credit for all proper items of taxes, county, city and school, insur-ance and repairs paid by her. As to the Gies property, the items were readily agreed upon as they appear in Finding No. 16.

In regard to the Garren property the item of repairs stated as "Towards improvements $500.00." The facts are, briefly, that this was a contribution of 125 barrels of beer, worth at cost $500.00, which Mrs. Seip and Ed-ward S. Veile in 1892, while they were operating the brewery, agreed to furnish to Jacob W. Garren, who had just leased the property for a term of years, as their con-tribution towards the cost of certain alterations and im-provements to the property, which Garren had under-taken to make. Mrs. Seip agreed to this only after Theresa Veile, the life tenant, had promised to pay the $500.00, cost value of the beer. Edward S. Veile died two days after Garren took possession in 1893, and Theresa Veile died the following year without having paid for the beer donated to Garren. The master thinks that the objection is well taken as this is clearly a debt of Theresa Veile and should have been collected from her estate. The credits allowed for repairs, taxes, insurance and water tax appear in Finding No. 18. As has been found above there is a difference between the brewery and the other two properties in regard to rents. There is also a difference in the matter of liability to contribute towards the cost of maintenance, repairs and taxes by the tenant

out of possession. It would be manifestly most inequitable to require such tenant to contribute anything whatever towards these items. The tenant in possession having the sole occupancy without rent, using and wearing out in the operation of the plant the fixtures and appliances and causing the rotting away of the floors and other portions of the buildings liable to decay, and generally bringing about a condition of disrepair and disintegration in the buildings themselves, is certainly not in position to ask contributions for up-keep from a cotenant who is getting nothing whatever out of the property. In Crest v. Jack, 3 Watts 238, the court say "One joint tenant or tenant in common cannot erect buildings or make improvements on the common property without the consent of the rest." They also say in Beatty v. Bordwell, 91 Pa. 438, "A tenant in common is liable to his cotenant for repairs that are absolutely necessary to houses and mills already erected and in being, which fall into decay." To the same effect is Dech's App., 57 Pa. 467. From April 8, 1906, to October 9, 1909, the statement shows expenditures for repairs totaling $706.96, of which $58.48 were paid in 1906, $523.18 in 1907, $93.07 in 1908, and $44.03 in 1909. A further analysis shows these payments were for

| | | |
|---|---:|---:|
| Concreting material | $80.65 | |
| Drains | 51.75 | |
| Roof | 22.28 | |
| Repairs to floors and alterations | 100.16 | |
| Surveys | 9.94 | |
| | | $264.78 |
| Stable | $219.93 | |
| Unplaced (witness no recollection) | 222.25 | |
| | | 442.18 |
| | | $706.96 |

. The payment of over $500 in 1907 indicates that more than "absolutely necessary" repairs were made. Expenditures upon the "stable" have already been passed upon as new construction and not allowable. The items of which the witness, Mr. Cope, had no recollection, amounting to $222.25, mainly for brick and iron, were not sufficiently shown to have been used in absolutely necessary repairs on the estate brewery, and cannot be allowed. The other items, amounting to $264.78, are allowed, as they seem to be for necessary repairs.

. It appears that prior to April 8, 1906, Mrs. Seip had expended a very large amount on repairs and improvements. The amount as appears in the statement presented from 1896, to April 8, 1906, is $4,543.22. The original brew house, a one-story brick structure, was taken down almost to the foundation and rebuilt as a two-story structure with addition for office. A new one-story building, called the wash house, 26 feet by 47 feet, was erected of brick, iron and concrete, with small addition known as pitch house. New floors of iron beams, hollow brick and concrete were put into the ice house, and generally this same material was used in making repairs and replacements in the most substantial manner wherever needed. An entirely new stable was built. Repairs and improvements of this character are clearly within the inhibition of the rule in Crest v. Jack, 3 Watts 238, and not the kind permitted in Beatty v. Bordwell, 91 Pa. 438. The master therefore feels that in addition to the reasons given above, the rejection of the credits prior to April 8, 1906, is warranted by the authorities; and further being a counter claim against the rental value covering the same period which the master has previously found to be barred by the statute of limitations, it must, also be barred.

. In arriving at the rental value of the brewery property the master has taken into consideration the value of the property as it was in 1894, its capacity at that time and the average output, together with the tes-

timony of A. H. Kress, who was called as an expert witness. He is a builder of large experience in Reading, Pennsylvania, who had also been in the distilling business for five years, had owned and operated a brewery for three years, had been called upon as an expert to appraise three other breweries, one of them at Northampton, this county, and is a large owner of real estate in and near Reading. He was able and clearly competent to estimate the value and capacity of this brewery, and with information as to its average output give such an opinion as to the value of the property in 1894 and its rental value as is of material assistance in this inquiry. Xavier Veile bought the half interest of his partner, Christian Tacke, in this real estate in 1871, for $10,000. He subsequently, in 1878, built the ice house, a two and a half story brick building, at a cost of $13,-000. At the time of his death the brewery was producing more than 2,800 barrels of beer and had a capacity of more than 4,000. Cost of beer in 1894 was about $4.00 and the selling price from $5.50 to $8.00. The cost has increased since then, but there is still a profit if sold at $5.50. By 1900 the output was 5,900 barrels. In the opinion of Mr. Kress, a brewery of the capacity of 4,000 barrels was worth $30,000, and had a rental value of $3,000, repairs and taxes to be paid by the tenant. His valuation of the property was fully confirmed by the defendant, who, a few weeks after he testified, bought it at the figure named. The master is of the opinion that the finding of a rental value of $3,000 per annum is fully sustained by the evidence.

The testimony in regard to the Garren and Gies properties shows that Mrs. Seip received from each tenant $600 per year in cash; that these tenants sold Veile's beer exclusively, although they were not restrained by their leases from handling other local beer; that they paid $7.20 per barrel up to 1898, and since then $7.70, while the same beer was sold to other saloon keepers, a block or two further up the street, for $6.50.

This decrease of price was solely due to the fact of competition with other breweries, of which competition the lessees of the Garren and Gies properties did not or could not avail themselves. The master is satisfied that this increase in the price of beer to her tenants was an advantage derived solely from the fact of her ownership of the properties, that it was virtually an indirect rental, a profit out of properties of which she was the trustee for her cotenant, and that she should account for it as rent. The amount of this indirect rent as found, $300, added to the $600 actual cash received, is $900. Compare this with rents paid for saloon properties in this neighborhood. One just across the street from the Gies property, as well located, the building about the same size and as well suited for the business, rents for $900, and the American Hotel, a much larger building in the same block rents for $1,200.

The county, city and school taxes on the brewery are assessed upon a valuation of the whole property comprised in the Veile brewery, consisting of that portion known as the Xavier Veile Estate, 80 feet by 194 feet, and the two adjacent properties on the north and south with their improvements, owned by Mrs. Seip. As Mrs. Seip is entitled to credit for taxes paid on the Xavier Veile Estate portion of the property from April 8, 1906, some apportionment must be made. A method can be devised from the city assessments. Prior to 1905 the assessment was $20,000. From that date, about the time the improvements on Mrs. Seip's individual property were added to the plant, the assessment was raised $15,000, representing these improvements. This gives a proportion of four-sevenths as the estate's share and three for Mrs. Seip. The calculations will be made on this basis.

In regard to defendant's seventh request, the master cannot find that the defendant, relying upon the agreement with the mother of plaintiff, expended large sums of money on the brewery and Garren properties and in

buying land adjoining the brewery and improving it, and cannot equitably be placed in the same position as she occupied before the agreement of May 7, 1894. Was she not relying upon the will of Xavier Veile under which Theresa Veile had the right to sell all the real estate if needed for her maintenance and support; upon the decision of the Court of Common Pleas that this gave her an estate in fee simple; upon the conveyance by Theresa Veile of all this real estate to third parties and its reconveyance to her by her grantees; upon the will of Theresa Veile, giving the defendant a life estate; upon the lease of the brewery executed by Theresa Veile to the defendant in 1894 for a period of 35 years at a rental of $260 per year? There was also the will of Xavier Veile which gave defendant a life estate in half of this property. It must be that all these contributed to the result. Besides the defendant gets the property at its value in 1894, and the fact that she gets it saves her from any loss by reason of her expenditures on the adjoining property. Such improvements as she made were essential to a modern brewery, and are just as valuable to the plant as when they were first put in. She got possession of this brewery fully equipped to produce beer. It was certainly incumbent upon her to maintain it. The renewals and replacements she made, the new equipment and enlarged facilities she provided are all there, belong to her, and she has suffered no loss by reason of them. So far as these expenditures are concerned she is in as good a position as she was before the agreement of May 7, 1894. But aside from these considerations, how can an agreement concerning the estate of a minor, made without the sanction of the court, by a person without any authority to act, whose action has been repudiated by the minor upon attaining her majority, be of any avail to this defendant? She herself brought about this situation by making the agreement with the mother instead of with the guardian. Certainly the plaintiff should

not suffer because of a condition of affairs to which she in no wise contributed.

The opinion of the Supreme Court states the facts. See also Fassitt v. Seip, 240 Pa. 406.

The court dismissed the exceptions.   Plaintiff and defendant appealed.

*Error assigned* was in dismissing the exceptions.

*E. J. Fox,* of *E. J. & J. W. Fox,* with him *James J. Cope,* for Belle R. Seip.

*Robert A. Stotz,* for T. Campbell Fassitt, guardian of Clarissa M. Veile.

OPINION BY MR. JUSTICE MESTREZAT, May 26, 1915:

This is a bill in equity filed May 1, 1913, by the plaintiff's guardian for the partition of three pieces of real estate held by the plaintiff and the defendant as tenants in common, and for an accounting of the rents and profits of the property while in the occupancy of the defendant.   The plaintiff became of age on June 12, 1913. A decree was entered in favor of the plaintiff January 26, 1915, from which both parties have taken an appeal. The appeals will be disposed of in one opinion.   The learned master made an exhaustive report in which he found the facts and stated his conclusions of law.   His findings and report were confirmed by the court below. It would serve no good purpose to review at length either his findings of fact or his conclusions of law, so far as they relate to the defendant's appeal, as we are all satisfied that it is without merit save in the minor details hereinafter noticed.

The principal question in the defendant's appeal is as to the validity of an alleged compromise or family settlement made by representatives of the plaintiff and the defendant by which they agreed to accept the provisions of the will and codicil of Mrs. Theresa Veile,

and that the income given to the child by the codicil to the will of Theresa Veile should be paid to her by the defendant. It is claimed on the part of the defendant that this was a family agreement which was intended to protect the defendant and also the interests of Clarissa M. Veile, the plaintiff, by giving her the income provided in the will of her grandmother. It is contended that the agreement was a compromise of possible litigation and accepted by all the parties in interest and that it bars the plaintiff from recovering from the defendant her share of the rental value of the property which was in the defendant's occupancy from 1894 until 1913, when it was determined by this court that the title to the premises was in the plaintiff and defendant as tenants in common. The agreement in question is a writing signed by Florence R. Veile for her daughter, Clarissa M. Veile, in which is recited a codicil to the will of Theresa Veile, the grandmother of the plaintiff and the mother of defendant, who claimed the property, by which the defendant was required to pay the plaintiff forty dollars per month, during the defendant's lifetime, and which writing acknowledged the receipt of forty dollars, being the first monthly payment under the codicil, and declared "that I accept all the provisions contained and set forth in said last will and testament and codicil thereto." This paper is dated May 7, 1894. At this time Clarissa Veile was not quite two years of age and the Easton Trust Company was her guardian. It is strenuously contended by the defendant, in an elaborate argument dealing with the testimony and the law, that this was a family settlement or compromise which is binding on the plaintiff, and deprives her of the right to recover her share of the rental value and income of the property from the date of the death of the life tenant, Mrs. Theresa Veile, until it was determined in 1913 by the decision of this court that the plaintiff was the owner of the undivided one-half interest in the property. We, however, entirely agree with the court below and

the learned master who found that "the acceptance by plaintiff's mother during plaintiff's minority of certain payments made to her by defendant pursuant to the terms of the will of Theresa Veile, and the acceptance by her (the mother) of the provisions contained in said will, which acceptance was ratified neither by the guardian nor by herself when she became of age, cannot be set up by defendant as a bar or defense to plaintiff's claim in this proceeding."

The facts are found and clearly stated by the learned master, and it does not appear that there were any other writings bearing on the question of the alleged settlement, or that the guardian of the plaintiff signed, ratified or approved it. The guardian was not present when the paper was executed by the mother of the child, was not consulted beforehand about it, and had no knowledge of it until the mother had signed it. It is unnecessary to discuss what took place between Mr. Scott and Mr. Cope, the attorneys alleged to have represented the interests of Mrs. Seip and the minor child and her mother, or the telephonic communication with Mr. James, the president of the Easton Trust Company, as the writing executed by the mother of the minor must be relied on to establish the family agreement. It is clear that she had no authority to bind her minor child or to make any agreement which would affect the latter's rights in the real estate in question or the income or profits arising therefrom: Senser v. Bower, 1 P. & W. 450; Heft v. McGill, 3 Pa. 256, 263; Groome v. Belt, 171 Pa. 74. It must be assumed that the eminent counsel, acting for the parties in the transaction, were fully aware, not only of the interest of the minor in the property but also of the only legal way in which it could be affected or divested. The president of the Easton Trust Company, the guardian, was also a lawyer of high professional standing and, therefore, manifestly knew that the mother's signature to the paper in question could not bind her infant child. The guardian did not sign the

paper and thereby become a party to the alleged family settlement. It received none of the annual payments directed to be made by the will of Theresa Veile. The annual installments were all paid to the mother and receipted for by her. In fact, Mrs. Seip and her counsel dealt entirely with the mother, to the exclusion of the guardian. Why the guardian did not act for its ward and execute the paper in question does not appear, but may be inferred from the fact that the alleged compromise was manifestly against the interests of its ward. The guardian repudiated the alleged settlement by bringing the action of ejectment in 1912 and subsequently filing this bill for an accounting of the rents, income and profits of the property while it was in the possession and occupancy of the defendant. The learned counsel who acted for Mrs. Seip and for the child's mother respectively and the president of the trust company knew that the guardian was the only party who could legally represent the child in effecting a settlement. There could be, therefore, no reasonable ground for the defendant's belief that the paper in question was a valid legal family settlement which bound Clarissa Veile, the two year old child. Mrs. Seip could not have been misled as to the effect of the paper in view of the fact that she was represented by such eminent counsel. In fact, the paper signed by the mother was not a release to Mrs. Seip, or anything but a receipt and a declaration that the mother, on behalf of her daughter, accepted all the provisions of Theresa Veile's will and codicil. The only inference that can be drawn from the whole transaction is that Mrs. Seip was willing to deal with the mother of the child instead of the guardian, and that the latter did not intend to bind itself or its ward by the paper executed by the mother. A chancellor cannot make an agreement for parties nor enforce an agreement against one who is not a party to it. We think the learned master and court below were clearly right in their con-

clusion as to the purpose and validity of the alleged agreement.

The rental value of the property during the defendant's occupancy and the application of the statute of limitations raised on the defendant's appeal are fully discussed by the learned master and require no further consideration here. An examination of the evidence does not convince us that the master erred as to the rental value for which the defendant should account. As said by the learned court below, the master fixed the rental value of these properties upon testimony that commended itself to him, and his findings have the effect of a verdict of a jury unless clearly erroneous.

We think, however, that the learned master and the court below should have allowed credits for one-half of such taxes, water rents, insurance and repairs on the brewery property as are shown by the evidence to have been paid by the defendant and for the monthly payments made by the defendant to the mother of the plaintiff during the whole period of the defendant's occupancy, to wit: since April 7, 1894, in view of the fact that we hold, as hereinafter stated, that the statute of limitations is not a bar to an accounting for the rental value of that property since that date. With the exception of these credits, the defendant's appeal must be dismissed. The master was right in holding that the defendant is not entitled to credit for expenditures for new buildings erected on the property, or for enlargements, reconstruction or improvements on the common property: Gregg v. Patterson, 9 W. & S. 197; Crest v. Jack, 3 Watts 238; Dech's App., 57 Pa. 467; Kelsey's App., 113 Pa. 119. We think there was no error in allowing interest on the rentals of the several properties as computed by the learned master.

The assignments filed by the plaintiff in her appeal raise but a single question, namely, whether, as the master and court below held, the statute of limitations is a bar to the plaintiff's right to an accounting for the

rental value or mesne profits of the brewery property beyond six years prior to the bringing of the ejectment suit. The master made a distinction between the status of the brewery property and the other two parcels of property included in the partition proceedings, on the ground that the defendant occupied and used the brewery property in person and, therefore, received no rental income as such therefrom, while the other two parcels were occupied by tenants from whom the defendant received rent. As to the other two parcels he held that the statute of limitations could not be invoked to prevent an accounting for the whole period of the defendant's occupancy of the property, and required her to account from the death of the life tenant in 1894. The plaintiff contends that the defendant cannot set up the statute to defeat an accounting for the whole period because (1) she was under legal disability, being a minor; and (2) because defendant both expressly and impliedly acknowledged liability to account, promised to pay the amount found due, and waived the statute.

The title to the property was in Xavier Veile who devised it to his widow, and after her death to his two children for life and then to his grandchildren. His widow, Theresa Veile, took possession of the property, claiming that under her husband's will she was entitled to the fee. She devised the property to her daughter, the defendant, with the provision that the devisee should pay Clarissa Veile, the plaintiff, forty dollars per month during the defendant's lifetime. At the death of her mother in 1894, the defendant took possession of the property, claiming to own it in fee simple, and retained possession until it was decided by this court in Fassitt v. Seip, 240 Pa. 406, that Theresa Veile had only a life estate with power of consumption and could not by will dispose of any estate derived under her husband's will remaining at her death. The title to the property was therefore in the plaintiff and defendant as tenants in common, the defendant having purchased the interests of her children

in 1902. The adverse holding by the defendant was from the death of the life tenant in 1894 until the rights of the parties were determined by the ejectment in 1913.

We think the learned court was in error in applying the statute during the period of the minority of the plaintiff, who was about two years of age in 1894 when defendant went into possession of the premises, and had not attained her majority when this proceeding was commenced in the court below.

Section 5 of the Act of March 27, 1713, 1 Sm. Laws 76, 2 Purd. 2293, provides, inter alia, as follows: "If any person or persons who is or shall be entitled to any such action of trespass, detinue, trover, replevin, actions of account, debt,.. . ...be, or at the time of any cause of such action given or accrued, fallen or come, shall be within the age of twenty-one years,......that then such person or persons shall be at liberty to bring the same actions, so as they take the same within such times as are hereby before limited, after their coming to or being of full age." The learned court below held that this section of the act, in favor of the minor, did not apply in the present case because she had a guardian who was appointed shortly after the defendant took possession of the premises and who could have protected her interests by an appropriate action at law or in equity. The master found that the rental value of the brewery property was $3,000 per annum during the whole time of its occupancy by the defendant. The latter is compelled by the court below, under its ruling, to account for the rentals for only six years prior to the institution of the action of ejectment, or from the year 1906, and not from the year 1894 when the defendant went into possession of the premises.

The section of the act just quoted makes no distinction between an infant with a guardian and without a guardian. It prevents the running of the statute in all cases where the person entitled to sue is within the age of twenty-one years, and permits such person to bring the

action after he arrives at full age. The legal title to the property was in the infant and not in her guardian and, therefore, the right of action was in the infant and not in the guardian. We can see no reason for the distinction made by the learned master and the court below between an infant without a guardian and one having a guardian. It is true, that a guardian may bring an action to protect his ward's interest, but if he fail to do so the infant may institute an appropriate action for enforcing his rights after he becomes of age. If the legal title was in a trustee or in a guardian it would be different, and in such case if the action was not brought within the statutory period it would be barred as to the person under disability during the period of limitation. Here, however, the legal title was in the infant and not in the guardian or in a trustee, and hence that rule cannot be invoked to deprive the beneficiary of her right of action after she has attained her majority.

In Wood on Limitation of Actions (3d Ed.), Sec. 238, the rule is announced as follows: "Persons who have not attained the age of majority are infants, and in those states where infancy is within the saving clause of the statute, the statute does not begin to run against him or her, even though he or she has a guardian who might sue the claim in question; nor even though other persons are jointly interested in the claim, who are of full age, until he or she attains the age of majority. The fact that a guardian or the infant himself brings a suit before the disability is removed does not operate as a waiver of the saving clause in favor of the disability." In 25 Cyc. 1260, 1261, citing many authorities to sustain the text, it is said: "In many jurisdictions, by express statutory enactment, or by judicial construction, where the statute excepts persons laboring under disabilities from its operation, without mentioning infants specifically, infants are within the saving clause of the statute, and the statute does not run against them during such disability, even where such infant has a guardian who might

maintain the action in his or her name, provided the title or right of action is in the infant." The rule announced in the text books is supported by numerous decisions: Fink v. Campbell, 70 Fed. 664; Snare & Triest Co. v. Friedman, 40 L. R. A. (N. S.) 367; Henley v. Robb, 86 Tenn. 474; Frost v. Eastern R. R. Co., 64 N. H. 220; Keating v. Mich. Cent. R. R. Co., 94 Mich. 219; Monroe v. Simmons, 86 Ga. 344, 346; North v. James, 61 Miss. 761. The distinction, suggested above, that the rule does not apply when the right of action is in a trustee who is vested with the legal estate and is competent to sue is adverted to and the cases sustaining it are cited in these authorities.

If, as suggested above, the legal title is in a guardian or trustee for a minor or other person under disability, the statute will run and the action must be brought within the statutory period or it will be a bar both as to the trustee and the beneficiary. This is the doctrine of the authorities cited and relied on by the learned master. In such cases the party entitled to sue has the legal title and labors under no disability and hence the action must be brought within the statutory period. The distinction between such cases and those where the legal title is in an infant or other person within the saving clause of the statute is pointed out in the text books referred to above and the numerous decisions on the subject.

In the case in hand, the title to the undivided one-half of the real estate was in the plaintiff from the date of her father's death, subject only to the life estate of her grandmother. The rentals claimed were due on this real estate and hence the right of action was in the plaintiff. The saving clause of the statute, therefore, protected her against the running of the statute until she became of age. It is true, that this suit was brought by her guardian, but, as will be observed under the authorities cited above, the bringing of such suit does not waive the exception to the statute of limitations. The statute was, therefore, not a bar to the plaintiff's right to recover her

share of the rentals of the brewery property from the date of the death of the life tenant in April, 1894. There is nothing in the Act of June 24, 1895, P. L. 237, which prevents a recovery thereunder of the rental value for the occupation of property held in common before the passage of the act.

We are also of the opinion that the defendant waived the benefit of the statute by the agreement of January 9, 1914. This agreement refers to the brewery property, and the fourth paragraph provides inter alia, that the master shall proceed to determine "the total amount of the net rental value of the premises for the period during which they have been in the use and occupancy of the defendant, to wit: from April 7, 1894, to the date hereof, in the same manner and to the same extent as if this agreement had not been made; and the plaintiff's share of such rental value, as thus found and determined, shall be added to her other interest in said premises as determined by the valuation herein agreed upon, to wit: one-half of $30,000, and deducted from the defendant's share or interest therein; the whole amount, to wit: the sum of $15,000 and the sum of one-half the net rental value of said premises, as thus found and determined, to be paid in cash by the defendant to the plaintiff." In paragraph 9 of the agreement reference is made to "the plaintiff's share of the net rental value, whatever the amount thereof may be." The only purpose and effect of the tenth paragraph, as disclosed by its language, was to preserve the right to claim credits for improvements, etc., made for the benefit of the property. If this right was reserved, why was not the right to plead the statute of limitations also reserved if it was so intended? This action was brought prior to the date of the agreement and the statute of limitations had not then been pleaded. We think the defendant by this agreement waived the benefit of the statute and agreed to pay the plaintiff one-half of the net rental value of

the brewery property from April 7, 1894, the date of the death of the life tenant.

The agreement of 1914 provides that there shall be deducted from the plaintiff's share of the net rental value of the brewery property the amounts of cash paid from time to time by the defendant to the plaintiff or to her guardian and mother since April 7, 1894. The master, however, only allowed as credits on the rentals the amounts paid within the six years, instead of allowing the total amount paid since April 7, 1894. The intention of the agreement, as disclosed by its language and as we have held, was that the master should determine the net rental value of the premises from the death of the life tenant in 1894 and award to the plaintiff her share thereof, less the total amount of cash paid to her during the same time. As suggested above in discussing the defendant's appeal, a credit should be allowed for the taxes, etc., paid by defendant on the brewery property during the same period.

Both appeals must be sustained and the decree modified to the extent indicated. The record will be remitted to the court below for the purpose of modifying its decree in accordance with the views expressed in this opinion. As thus modified, the decree of the court below is affirmed.